931 F.2d 886
Unpublished Disposition
 NOTICE: Fourth Circuit I.O.P. 36.6 states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Fourth Circuit.
Linda V. CAWTHON, Plaintiff-Appellant,
v.
Louis W. SULLIVAN, Secretary of Health and Human Services,
Defendant-Appellee.
 No. 90-2107.
 United States Court of Appeals, Fourth Circuit.
 Submitted Nov. 30, 1990.
Decided April 29, 1991.
As Amended July 15, 1991.
 
 Appeal from the United States District Court for the Northern District of West Virginia, at Clarksburg. William M. Kidd, Senior District Judge. (CA-88-14-C-K)
 Jeffrey L. Hall, Law Offices of Montie Van Nostrand, Webster Springs, W.Va., for appellant.
 Eileen Bradley, Chief Counsel, Region III, William B. Reeser, Supervisory Assistant Regional Counsel, Robert S. Drum, Assistant Regional Counsel, Office of the General Counsel, Department of Health & Human Services, Philadelphia, Pa., William A. Kolibash, United States Attorney, Lisa A. Grimes, Assistant United States Attorney, Wheeling, W. Va., for appellee.
 N.D.W.Va.
 REVERSED IN PART AND REMANDED.
 Before DONALD RUSSELL, K.K. HALL and MURNAGHAN, Circuit Judges.
 PER CURIAM:
 
 
 1
 The appellant, Linda Cawthon, is a Social Security claimant who, following the establishment of her right to benefits, seeks now to recover attorney's fees under the Equal Access to Justice Act, 28 U.S.C. Sec. 2412(d). That the Act encompasses claims for Social Security benefits is well settled. Hicks v. Heckler, 756 F.2d 1022, 1025 (4th Cir.1985); Pirus v. Bowen, 869 F.2d 536, 540 (9th Cir.1989). The language of the Act is clear: it provides that a prevailing party in a suit against the United States shall be awarded "fees and other expenses unless the court finds that the position of the United States was substantially justified or that special circumstances make an award unjust." A critical term in the statute is "substantially justified." It is also important to determine whether the burden of establishing substantial justification rests on the government. Pierce v. Underwood, 487 U.S. 552, 564-65 (1988), answered both questions. It defined the term "substantially justified" to mean "justified to a degree that could satisfy a reasonable person," or "justified in substance or in the main," or as having a "reasonable basis both in law and fact," the phrase adopted by us earlier in Anderson v. Heckler, 756 F.2d 1011, 1013 (4th Cir.1985), and reaffirmed after Pierce in Lively v. Bowen, 858 F.2d 177, 180 (4th Cir.1988). It also declared that, in a case involving the application of the statute, the finding of the district judge is to be given deference and appellate review is to be had under an abuse of discretion standard. Pierce, 487 U.S. at 562-63. The district judge found that, applying that standard of review to the facts of this case, the claimant was not entitled to an award of fees. We reverse that ruling in part and remand for further proceedings consonant with the later rulings herein.
 
 I.
 
 2
 The claimant sought disability benefits as of December 2, 1981, later amending that date to December 12, 1982. She fixed the beginning date of her disability by the occurrence of her first grand mal seizure. The seizure occurred in the middle of the night at her home. She was promptly taken to the Charleston Area Hospital, where she remained for four days. While at the hospital, she was given a thorough examination by the attending physicians there. She gave the examining physician at the hospital the information that prior to this seizure she had had no "known seizures." During her examination she was found normal in connection with a skull X-ray, a C-spine test, and a CT-scan with contrast. However, the EEG examination recorded at the hospital showed a "grossly abnormal record showing frequent bursts of paroxysmal activity particularly during drowsiness." "Paroxysmal activity," according to Taber's Cyclopedic Medical Dictionary at 1050 (14th ed. 1986), is defined as a sudden spasm or convulsion of any kind or the exacerbation of the symptoms of a disease. The malady did not manifest itself in the claimant's case according to the claimant, as "the convulsion kind" but as more like a "starring spell," a "lapse of awareness" or of "memory" that "lasts but a few seconds." She has had these moments both while standing or sitting during which she does not fall or give any manifestations of any kind other than of lapses of memory.[1] She was dismissed with a prescription for Phenobarbital, which is a recognized remedy for grand mal seizures.
 
 
 3
 From December 12, 1982, until January 1985, the administrative file contains no records or reports regarding the claimant's medical condition or disability. The file shows that in January 1985 she was seen as an outpatient at the Stonewall Jackson Memorial Hospital for treatment of a swollen hand and pain from her right hand to her elbow. The diagnosis of her condition was probable edema of the median nerve of her arm and carpal tunnel syndrome. She later in January 1985 saw her family physician, Dr. Campbell, because of pain and intermittent swelling of the fourth and fifth fingers of her hands. In his record of the claimant's medical history, Dr. Campbell, the family physician, entered this comment: "Seizure disorder--no further problem." Subsequently, in February, April, May, August, and September 1985, Dr. Campbell saw the claimant. At such visits, the claimant had her pulse, blood pressure and weight recorded. Dr. Campbell, in his notes, makes no reference to any subjective complaints of the claimant nor did he prescribe any treatment beyond a prescription for Motrin. Dr. Campbell did, however, refer the claimant to two certified neurologists for a further opinion on the claimant's seizure disorder and to a rheumatologist for expert advice on the claimant's arthritic claim.
 
 
 4
 The first neurologist seen by the claimant under reference by Dr. Campbell was Dr. Alex Corey, a Board-certified neurologist, who saw the claimant in November 1985. In his letter to Dr. Campbell detailing his examination, Dr. Corey diagnosed the claimant's neurological condition as "partial-complex seizure disorder." He stated that the claimant's seizures were "fairly wellcontrolled at present, despite the fact that her anti-convulsant [blood levels] are in the lower therapeutic range." He recommended increased dosage of Phenobarbital, with follow-up in two months.
 
 
 5
 In March 1986 the claimant was referred by Dr. Campbell to another neurologist, Dr. Thomas W. Crosby. The claimant told Dr. Crosby that her first generalized seizures occurred in 1982, but she had gone as long as a year without having any such seizures. The claimant said she had had one in January 1986 and another earlier, in October 1985. In connection with the claimant's complex partial seizures or "starring spells," Dr. Crosby expressed the feeling that such may have been exacerbated by a recently elevated (and possibly toxic) Dilantin blood level, secondary to the dosage of 400 mgs. of Dilantin per day. He suggested an alternative anti-convulsant medication, Tegretol. Dr. Crosby saw the claimant again on September 24, 1986. He noted at that time that the claimant was having no "side effects" from the use of the Tegretol and she continued to be free of generalized seizures. She still complained, however, of episodes of "very mild confusion without loss of consciousness." These episodes, Dr. Crosby thought, did not resemble the previous episodes of "starring spells" but that her seizures were "adequately controlled" at that time.
 
 
 6
 For her arthritic condition, the claimant was referred to Dr. Brian Houston, a rheumatologist, first on October 14, 1985, and later in January 1986. In his first examination, Dr. Houston conducted certain tests and took some X-rays of the claimant's wrist and hands. Various laboratory tests such as sedimentation rate, ANA and RA tiber proved negative for arthritis. Dr. Houston found it "very difficult to make a firm diagnosis" but did prescribe Feldene, a muscle relaxant for the claimant. Again in November 1985 Dr. Houston saw the claimant. After an examination, he concluded that the claimant had an early active sero rheumatoid arthritis. He prescribed a well-known prescription arthritis medicine, Naprosyn. In commenting in this connection in a letter to Dr. Campbell on his examination, Dr. Houston stated that the plaintiff had active rheumatoid arthritis which was sero positive.
 
 
 7
 At this point, with reports from experts both in connection with the claimant's seizures and her arthritis, the claimant was examined by Dr. James Dollison at the request of the Secretary. Dr. Dollison conducted an extensive and thorough examination of the claimant. His examination and its results and recommendations were set forth in considerable detail in his report to the Disability Determination Section. He expressed his diagnosis of the claimant's disability in the form of two "impressions" on the claimant's condition: (1) "Seizure disorder, grand mal variety, with borderline control" and (2) "Rheumatoid arthritis with left knee effusion and severe involvement of the proximal interphalangeal joints of both hands." He commented further that the claimant was "liable to have a seizure at any time ... without any aura or warning and could represent a danger to herself or her co-workers in any job situation." He said the claimant also showed "evidence of current inflammatory changes with redness, heat, and erythema of the proximal interphalangeal joints of the hands and some joint freezing ... [and] a left knee effusion and has joint instability." His final opinion was that "the combination of her two organic deficits would render her unsuited for any type of gainful employment, since, as mentioned, her seizures could be dangerous to both the patient and her co-workers. In addition, her rheumatoid disease seems to be progressing very rapidly and is obviously not under control with her current therapy."
 
 
 8
 The claimant was administratively denied benefits, whereupon she sought and was given a hearing before Administrative Law Judge Moore on May 13, 1987. The claimant testified fully about her background, the onset of her seizure and "starring spells" and the quick development of her severe arthritic condition. A vocational witness was interrogated. After considering the testimony of the vocational expert and the medical reports, Administrative Law Judge Moore found that, though "the claimant has a severe impairment," it did "not meet or equal in severity and duration an impairment set forth in the Listing of Impairments." In his report, the administrative law judge took up better than half of the page in reviewing Dr. Dollison's exhaustive examination of the claimant. It was his decision that the claimant did not qualify for benefits. He did not comment on the final opinion of Dr. Dollison that the claimant was not able to engage in any gainful employment because of her two disabilities. The Appeals Council let this decision stand as the decision of the Secretary.
 
 
 9
 The claimant appealed that decision of the Secretary by filing suit in the district court. After filing that suit, the claimant moved to remand to the Secretary the proceedings for reconsideration in the light of one additional item of evidence. This new evidence consisted of the report of an examination of the claimant by Dr. John W. Byrd on March 8, 1988. Dr. Byrd's diagnosis of the claimant's physical disability was "uncontrolled pain and swelling of elbows, wrists, metacarpal phalangeal joints, left knee and both ankles. She has incomplete curl of her hands, walks with a wide based, painful gait." Dr. Byrd added that "Mrs. Cawthon's constant pain in aforementioned joints is due to her uncontrolled rheumatoid arthritis." He concluded that the claimant was "not capable of any work at all." The Secretary agreed to the remand.
 
 
 10
 On remand, the claim was referred to Administrative Law Judge Costanzo. After he had "carefully considered all the documents identified in the record as Exhibits, the testimony at the previous hearing, and the arguments presented," Administrative Law Judge Costanzo filed his decision that "the claimant [was] entitled to a period of disability commencing February 24, 1986, and to disability insurance benefits." In arriving at that decision, he did review Dr. Byrd's report, but recognized that since such report referred to claimant's condition at the time of the examination in 1988, it remained for him to "determine whether the claimant was disabled on or prior to her date last insured of December 31, 1986." He concluded "that the claimant became totally incapable of performing any substantial gainful activity on February 24, 1986, the date of her examination by Dr. Dolison [sic]." That decision became the decision of the Secretary, and the court action was dismissed with the agreement of the parties.
 
 
 11
 With this allowance of her claim, the claimant filed her petition for the allowance of attorney's fees. That petition was referred for decision to the magistrate judge. The magistrate judge concluded that, until the filing of Dr. Byrd's report of examination, the Secretary had established that his denial of the claim for attorney's fees was "substantially justified." He accordingly dismissed the petition for attorney's fees. We disagree.
 
 II.
 
 12
 The final opinion of the Secretary (the decision of Administrative Law Judge Costanzo) is that the claimant had established her qualification for Social Security insurance benefits on February 24, 1986, and she did this according to the administrative law judge's clearly expressed determination on the basis of the report of the claimant's examination by Dr. John Dollison on that date. That report of Dr. Dollison was the final act which established the rights of the claimant and it was that date which established the beginning date for the claimant's entitlement to benefits. It must be remembered that Dr. Dollison conducted his examination at the instance of the Secretary and not of the claimant. He was in effect the Secretary's own expert witness. That report of Dr. Dollison was a part of the record before Administrative Law Judge Moore. On the basis of that report and the preceding reports of examining doctors, the claimant was entitled to her benefits.
 
 
 13
 The district judge, in denying the claimant attorney's fees, assumes incorrectly that the claimant had not established her right to benefits until Dr. Byrd examined the claimant in 1988. Dr. Byrd's examination did establish that the claimant was totally disabled in 1988 at the time of his examination. But in so doing, he merely confirmed the opinion expressed by Dr. Dollison two years earlier, in February 1986. Nor would benefits have been awarded on Dr. Byrd's report alone. That report covered an examination made two years after the claimant's right to benefit had expired. Administrative Law Judge Costanzo recognized this, for he remarked, after he had reviewed Dr. Byrd's report of examination, "However, it is necessary to determine whether the claimant was disabled on or prior to her date last insured of December 31, 1986." In short, Administrative Law Judge Costanzo was stating implicitly that Dr. Byrd's report was inadequate to establish that the claimant was "disabled" under the Act "on or prior" the termination of her entitlement rights. For purposes of making that dispositive finding, the administrative law judge looked to Dr. Dollison's report of examination on February 24, 1986, and he found that that report established, as of the date of Dr. Dollison's examination, the claimant's entitlement. That examination and Dr. Dollison's report predated the decision of Administrative Law Judge Moore. But Administrative Law Judge Costanzo distinguished his decision from that of Administrative Law Judge Moore with this concluding statement in his "Statement of the Case":
 
 
 14
 The Administrative Law Judge concurs with the previous decision by the Administrative Law Judge in his decision of July 21, 1987, to the extent that the claimant remained capable of performing a wide range of sedentary work activity prior to February 24, 1986.
 
 
 15
 The district judge seems to base his denial of the claimant's motion for attorney's fees on the difference we perceived between the examinations and reports of Dr. Dollison and Dr. Byrd. It declares that "the ALJ [in the second decision] had clinical findings and a firm opinion from a treating physician that could support the earlier reports which the first ALJ did not have." Dr. Dollison's report on his examination covers eight pages in the record with a very extensive record of various clinical studies or experiments; Dr. Byrd's report consists of three pages of stereotyped material, none of which deals directly with clinical findings. Beyond the comparison of the two reports, the clincher argument that the final decision in this case (i.e., the decision of Administrative Law Judge Costanzo) was based expressly on Dr. Dollison's examination and not on Dr. Byrd's is the flat statement to that effect by Administrative Law Judge Costanzo. The district court was in plain error in finding to the contrary. Accordingly, the claimant is entitled to attorney's fees for all services rendered subsequent to February 11, 1988.
 
 
 16
 The cause is remanded to the district court with instructions to award the claimant attorney's fees for all services found to have been rendered her subsequent to February 11, 1988.
 
 
 17
 REVERSED IN PART AND REMANDED WITH INSTRUCTIONS.
 
 
 
 [1]
 The claimant's actual description of her action during one of these "starring spells" was:
 A. It only last for a few seconds but I don't have the convulsion kind any more but I also don't, I'm not aware of, you know, what I'm doing at the time.
 Q. Were you seated at the time?
 A. Yes.
 Q. Okay. So when you came to a few seconds a later?
 A. Right.
 Q. Were you still in a seated position?
 A. Yes.
 Q. So is it fair to say that really what happens to you is you have a lapse of memory, you don't know what's going on and it lasts but a few seconds?
 A. Right.
 Q. Have you ever had such seizure like that in a standing position?
 A. Yes.
 Q. And when you come to, are you still standing?
 A. Yes.